# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Personal Restraint of: | No. 57397-1-II |
| ANTOINE JOSEPH PERRY, | |
| Petitioner. | PUBLISHED OPINION |

PRICE, J. — In his personal restraint petition (PRP), Antoine J. Perry challenges his convictions for second degree rape, second degree assault, and unlawful imprisonment. Perry argues that "Juror 8" exhibited actual bias during jury selection, that the State committed prosecutorial misconduct, and that he was wrongfully deprived of credit for time he served before trial.

We disagree and deny Perry's petition.

## FACTS

### I. BACKGROUND

In 2016, Perry, a 26-year-old man, began following 15-year-old T.G. on the social media platform Snapchat. Perry engaged with T.G. by commenting on her stories and responding to her photographs.

One day, after T.G. posted that she was hungry and could not make herself something to eat, Perry offered to bring her food. T.G. initially refused. But Perry continued to message her on Snapchat with the offer, and she eventually agreed. Perry brought her food in his car and parked in front of T.G.'s house. T.G. got into the front seat.

Initially, Perry tried kissing and touching T.G., and she told him to stop. Perry then reached under his seat and told T.G. to get into the back seat. Fearing Perry had a gun, T.G. complied. In the back seat, Perry raped T.G. When T.G. resisted, Perry strangled her.

Three weeks after raping T.G., Perry allegedly raped another person, C.B., under similar circumstances, including using Snapchat and providing food as an excuse for meeting.

In May 2017, following its investigation into T.G.'s allegations, the State charged Perry with second degree rape, second degree assault, and unlawful imprisonment.

On May 8, the Pierce County Superior Court issued a bench warrant for Perry's arrest. At the time the bench warrant was issued, Perry was being held in the Thurston County jail, awaiting trial on other charges. Perry remained in Thurston County jail until March 2018, when he was transferred to the Pierce County jail for arraignment on this case. His arraignment occurred on March 5, 2018. Several months later, the Thurston County Superior Court dismissed Perry's other charges in that county.

Perry's Pierce County case proceeded to a jury trial.

II. JURY SELECTION

A. JUROR 8'S RESPONSES TO WRITTEN QUESTIONNAIRE

Jury selection began with each prospective juror completing a written questionnaire. To the question, "When women say they have been raped[,] it is most likely true[?]" Juror 8 wrote that she strongly agreed. Br. of Resp't app. at 210. In response to a question asking whether she believed that false accusations of sexual assault or misconduct are made, Juror 8 wrote a checkmark next to the word, "No," and explained, "I believe when an accusation of sexual assault happens, something must have happened to the victim." Br. of Resp't app. at 210.

Another question asked Juror 8 whether she believed that an individual accused of sexual assault or misconduct by more than one person must be guilty, and she checked, "Yes." Br. of Resp't app. at 211. Juror 8 explained that in such a situation an individual is "most likely guilty of some misconduct." Br. of Resp't app. at 211.

But when the questionnaire asked if there was any reason that she could not be a fair and impartial juror in a case where the defendant was charged with second degree rape, she answered, "No." Br. of Resp't app. at 211.

B. THE PARTIES QUESTIONING OF JUROR 8

Following review of the written questionnaires, the trial court and the parties questioned certain jurors, including Juror 8, outside the presence of other jurors. Juror 8 began by agreeing that part of her role as a juror would be to "listen carefully to the evidence." 2 Verbatim Rep. of Proc. (VRP) (July 16, 2019) at 90.

The State then asked Juror 8 to explain her questionnaire answer that if someone was accused by multiple people that they are "most likely guilty of some misconduct." 2 VRP at 91. Juror 8 explained,

> Well, I think I didn't know exactly what the accusation was and just being fairly new to all of this information, I was assuming it was about a sexual assault accusation.
>
> . . . .
>
> And not being extremely knowledgeable, honestly, because I've never been through this, I think there might be a broad definition of sexual assault. Some people may feel they're assaulted if they're just fondled inappropriately. It might have been a more severe medical type of assault that there's some evidence for that, some sort of assault, so I guess that was why I said most likely. I didn't understand it. It was too broad of a question for me to know exactly.

2 VRP at 91-92.

3

The State asked about situations when there are multiple accusations—specifically whether Juror 8 could view evidence of a second sexual assault accusation only for a limited purpose and not to assume the defendant was guilty of both accusations:

> [Prosecutor]: So if you're told -- if you hear about two accusations of sexual assault and you're asked to determine whether one of them is true and you're told that that other accusation can't be used to determine whether or not the State has proven its case because it avoids, well, if they've done it before, they'll do it again, right? That's not how our system of justice works, okay? What we're looking at here is one incident, and so if the [c]ourt tells you that you're not allowed to use that other accusation for any other reason other than what the judge tells you to use that other accusation for, can you follow that?
>
> [Juror 8]: Yes.

2 VRP at 92.

When defense counsel had his turn, he asked Juror 8 about her questionnaire statement that said, "I believe when an accusation of sexual assault happens, something must have happened to the victim." 2 VRP at 93 (internal quotation marks omitted). Juror 8 explained,

> I would think that something must have happened for them to make that accusation somehow. I don't think you just -- I wouldn't, as a person, just make that accusation out of the sky for revenge. I just don't -- I just don't quite believe that somebody would make an accusation that they were sexually assaulted because they wanted to get at somebody because it's such a heinous . . . I just can't imagine somebody doing that. . . .

2 VRP at 93.

Defense counsel asked Juror 8 whether she would believe someone who testified that they were raped. 2 VRP at 93. Juror 8 answered that she would also like to see supporting medical evidence stating,

> Well, if some evidence shows it. I would like to see -- I would like to see some -- I think you can have evidence of rape, some medical evidence, so I would like to see that medical evidence that indeed they were raped medically.

4

2 VRP at 93-94.

Defense counsel then asked Juror 8 whether she believed that Perry was presumed innocent, and the following exchange occurred:

> [Juror 8]: I have to believe that. That's the law, isn't it? Everybody is presumed innocent. I wouldn't know until I heard about it, so I would, knowing that that's the law or, you know, that's what we're based on in this country, I would presume that they are innocent until proven otherwise.
>
> [Defense counsel]: And even if someone is accusing him of, say, rape or sexual assault?
>
> [Juror 8]: Yeah. Yes, unless it was -- I guess in my mind I would have to see the evidence. I'd have to see that.

2 VRP at 94.

Thereafter, defense counsel asked Juror 8 whether someone is more likely guilty because two or three people accused them instead of one. Juror 8 gave an equivocal response, stating,

> I just can't answer that right off the top. Probably. I think three or four would -- I don't know. I honestly can't answer that because I don't know. Again, I'll just tell you everything honestly about me. I watched the Brett Kavanaugh hearings. That was so politically involved, I didn't know what to believe on that one. So that's what goes through my mind when you say if one or two people accused somebody does that make them more guilty. I just don't know.

2 VRP at 94-95.

During the questioning of the entire juror pool, defense counsel specifically asked Juror 8 if she could envision a scenario where a person claims they were raped, but in reality, they just regretted their actions. Juror 8 said she could see that happening "especially with drugs and alcohol" being involved because they impair judgment. 3 VRP at 337.

Following the questioning of all of the prospective jurors, the parties exercised their challenges and selected the jury. Juror 8 was selected and served on the jury. Neither the State nor defense counsel chose to challenge her for cause or use a peremptory challenge against her. Defense counsel completed jury selection with unused peremptory challenges, only having used four of his six challenges.

III. TRIAL TESTIMONY

Following jury selection, the case proceeded to the presentation of witnesses and evidence. T.G., law enforcement, T.G.'s mother, a sexual assault nurse examiner, and C.B. (the other alleged victim) all testified at trial consistently with the above facts.

T.G. testified that she got into the back seat as Perry directed because she believed he was searching for a gun. During cross-examination of T.G., defense counsel asked whether she remembered saying that she felt she had some responsibility to get into the back seat of the car because Perry had brought her food, and the following exchange took place:

> [Defense counsel]: [During the defense interview] do you remember we asked you why you went into the back seat. Do you remember telling us that you felt like you had some responsibility because he brought you food[?]
>
> [T.G.]: A little, that -- yeah.
>
> [Defense counsel]: So you felt you had to repay him somehow for the kindness of bringing you food even though it wasn't quite what you wanted?
>
> [T.G.]: No.
>
> [Defense counsel]: Well, when you say you had a responsibility because he brought me food, what else could it mean? Why else would you get in the back seat on your own?
>
> [T.G.]: I got in the back seat because I was scared. That could have played a part in it, yes. That could have played a part in the fact that he brought me food and I

didn't believe that he was going to take it this far and rape me. If I did, me feeling bad about food would not be in the equation at all.

[Defense counsel]: So you got into the back seat of your own accord because you felt you had a responsibility --

[T.G.]: No, I got into the back seat on my accord because I was scared.

4 VRP at 462.

C.B., the other alleged rape victim, was then allowed to testify about the details of her interaction with Perry. C.B. testified that before Perry raped her, she posted on her Snapchat story asking for someone to bring her food while she was babysitting. Perry responded and drove to the house with food. When C.B. got into Perry's car, he asked her where he could pick up cigars to use for smoking marijuana. C.B. explained they could go to a nearby gas station.

After Perry bought the cigars, he asked C.B. to smoke with him. C.B. declined because she was babysitting and asked him to take her back to the house. But C.B. testified that, instead of returning her to the house, Perry raped her.

Perry testified in his own defense and discussed C.B.'s testimony, telling a very different version of events. He said that in addition to requesting food, C.B. also asked him to bring her marijuana. Perry said he bought marijuana with cash and drove to the address that C.B. sent him. Once he arrived with the food and marijuana, C.B. got in the car and asked Perry to take her to a gas station to get cigars to roll marijuana. (Perry testified that people buy cigars to smoke marijuana by splitting the cigar open, emptying the tobacco, and putting the marijuana inside.) He then drove to the gas station and bought the cigars with a debit card because he was out of cash after previously buying marijuana.

Perry testified that while he was driving C.B. back to the house after buying the cigars, he pulled over to look for his phone because he was not sure if he left it at the gas station. As Perry searched the car for his phone, C.B. grabbed him, and they began "kissing and touching each other." 7 VRP at 728. According to Perry, this eventually resulted in consensual sex.

IV. CLOSING ARGUMENT AND VERDICT

After both parties rested, the case proceeded to closing arguments.

The State argued that T.G. got into the back seat of Perry's car because she was "scared; she was frightened," not because she was "paying Mr. Perry back." 8 VRP at 828. In contrast, the defense claimed that T.G. got into the back seat voluntarily and suggested that she might have felt a "responsibility" to pay Perry back for the food that he provided her. 8 VRP at 852.

The State also argued that the incidents between T.G. and C.B. were so similar that the jury could consider C.B.'s testimony as a common plan or scheme in determining Perry's intent—specifically on the questions of forcible compulsion or lack of consent.

In response, defense counsel discussed the testimony about the debit card and the marijuana. Defense counsel suggested that Perry did not have a common plan to use Snapchat to rape women because if he had intended to rape C.B., he would not have used his debit card to buy the cigars; such a purchase would be easily traced by law enforcement. Then, referring to the testimony about C.B. and marijuana, defense counsel suggested that perhaps Perry's meetup with T.G. was actually about marijuana. Defense counsel argued,

> I suspect we haven't gotten the full story because that question is still there, especially in [T.G.'s] case where her mother was home. She could have gotten her the food. She didn't. She would rather call a stranger for some reason. Could it be that the request by [C.B.] for food really wasn't for food? Maybe "food" was a code word for marijuana. We can't rule that out. He brought it. The evidence certainly suggests that that was the case, and maybe that's the reason why we're

not getting the full story.  Maybe this was all about marijuana, perhaps, in both instances.  We don't know.

8 VRP at 863.

In rebuttal, the State responded to these arguments, stating that it was unsure why Perry used his debit card to buy the cigars with C.B. but suggested that he could have done so as a step "to achieve his ultimate goal."  8 VRP at 868-69.  The State argued,

> Why did he use his debit card?  I have no idea.  What [defense counsel] is asking you to do is believe if he's that stupid, I guess, that he wouldn't use his debit card.  Doesn't that weigh one way just as much as it weighs the other way?  I don't know why he used his debit card.  Because maybe he thought if he was able to get that marijuana and roll that marijuana, that it was one step that he could use to achieve his ultimate goal.

8 VRP at 868-69.

Perry did not object to any of the State's arguments.

## V.  VERDICT AND POST-VERDICT PROCEDURE

Following deliberation, the jury found Perry guilty of all counts.  The trial court sentenced him to 161 months to life in prison.

Perry's judgment and sentence provided that the Department of Corrections (DOC) would calculate credit for eligible time served prior to sentencing.  Specifically, the judgment and sentence stated, "Credit for Time Served.  The defendant shall receive credit for eligible time served prior to sentencing if that confinement was solely under this cause number.  RCW 9.94A.505. DOC shall compute time served."  Clerk's Papers at 224.

Perry filed a direct appeal in which, among other things, he argued that C.B.'s testimony should not have been admitted as a common scheme or plan.  *State v. Perry*, No. 54165-3-II, slip

op. at 4 (Wash. Ct. App. June 2, 2021) (unpublished).[1]  This court affirmed.  *Id.* at 9.  Our Supreme

Court denied review.  *State v. Perry*, 198 Wn.2d 1019, 497 P.3d 375 (2021).

Perry filed this timely PRP.

## ANALYSIS

Relief by way of a collateral challenge through a PRP is extraordinary; the petitioner must

meet a high standard before this court will disturb an otherwise settled judgment.  *In re Pers.*

*Restraint of Coats*, 173 Wn.2d 123, 132, 267 P.3d 324 (2011).  To obtain relief in a personal

restraint petition, a petitioner must demonstrate either a constitutional error resulting in actual and

substantial prejudice or a nonconstitutional error that is a fundamental defect resulting in a

complete miscarriage of justice.  *In re Pers. Restraint of Swagerty*, 186 Wn.2d 801, 807, 383 P.3d

454 (2016).  If the petitioner fails to demonstrate actual and substantial prejudice or a fundamental

defect, we deny the personal restraint petition.  *In re Pers. Restraint of Schreiber*, 189 Wn. App.

110, 113, 357 P.3d 668 (2015).

In his PRP, Perry seeks collateral relief based on three arguments.  First, he argues that

Juror 8 exhibited actual bias and the trial court erred in failing to dismiss, sua sponte, Juror 8.

Second, Perry argues that the State committed prosecutorial misconduct in closing arguments.

And third, Perry argues he was wrongly deprived of credit for time he served before trial.[2]

Each argument will be addressed in turn.

---

[1] https://www.courts.wa.gov/opinions/pdf/D2%2054165-3-II%20Unpublished%20Opinion.pdf.

[2] Two separate briefs support Perry's PRP.  In September 2022, Perry filed a petition.  After counsel was appointed, Perry's counsel filed a supplemental brief in April 2023.  Perry's petition makes all three arguments.  Counsel's brief is limited to the issues of juror bias and credit for time served.

I. JUROR BIAS

Perry argues that Juror 8 exhibited actual bias by suggesting she would always believe a female accuser in a case of sexual assault. Consequently, he contends the trial court erred in failing to dismiss Juror 8 for exhibiting actual bias. We disagree.

A. LEGAL PRINCIPLES

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee a criminal defendant the right to trial by an impartial jury. *State v. Guevara Diaz*, 11 Wn. App. 2d 843, 854-55, 456 P.3d 869, *review denied*, 195 Wn.2d 1025 (2020). A party may challenge a juror for cause if the party can show actual bias. RCW 4.44.170(2). Actual bias is defined as

> the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging . . . .

RCW 4.44.170(2).

But the fact that a juror expresses or forms an opinion is insufficient to sustain a challenge. RCW 4.44.190. Instead, "the court must be satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially." *Id.*

Equivocal answers are insufficient to establish actual bias. *State v. Sassen Van Elsloo*, 191 Wn.2d 798, 808-09, 425 P.3d 807 (2018). The record must demonstrate that there was a *probability* of actual bias; a mere *possibility* of bias is insufficient. *Id.* at 809.

Typically, the parties request the removal of jurors through the exercise of challenges. But even without a challenge from a party, the trial court has the authority to dismiss a juror during jury selection from both statute and court rule. RCW 2.36.110 provides,

11

It shall be the duty of a judge to excuse from further jury service any juror, who *in the opinion of the judge*, has manifested unfitness as a juror by reason of *bias*, prejudice, indifference, inattention or any physical or mental defect or by reason of conduct or practices incompatible with proper and efficient jury service.

(Emphasis added.)  And CrR 6.4(c)(1) provides,

If the judge after examination of any juror *is of the opinion* that grounds for challenge are present, he or she shall excuse that juror from the trial of the case.  If the judge does not excuse the juror, any party may challenge the juror for cause.

(Emphasis added.)

However, judges should tread carefully; a "trial court should exercise caution before injecting itself into the jury[-]selection process." *State v. Lawler*, 194 Wn. App. 275, 284, 374 P.3d 278, *review denied*, 186 Wn.2d 1020 (2016).  "Trial counsel may have legitimate, tactical reasons not to challenge a juror who may have given responses that suggest some bias." *Id.* at 285. As a result, a trial court that excuses a juror sua sponte risks disrupting counsel's jury-selection strategy. *Id.*

Except in a clear case, appellate courts are in a poor position to second-guess the trial court on these issues.  Indeed, the trial court is in the best position to evaluate whether a juror should be dismissed because it can assess the juror's "tone of voice, facial expressions, body language, or other forms of nonverbal communication when making his [or her] statements." *Id.* at 287.  We therefore review the trial court's decision to not excuse a juror for an abuse of discretion. *See Sassen Van Elsloo*, 191 Wn.2d at 806.  A trial court abuses its discretion when its decision is " 'manifestly unreasonable or based on untenable grounds.' " *Id.* at 807 (quoting *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 339, 858 P.2d 1054 (1993)).

B.  APPLICATION

Perry argues that Juror 8 should not have served as a juror in this case because her answers to the written questionnaire demonstrated actual bias in favor of believing a female victim in a case of sexual assault.  He further argues that the individual and group questioning of Juror 8 did not rehabilitate her actual bias because it did not demonstrate that she could be fair.  Even though his defense counsel failed to challenge Juror 8, Perry argues that the trial court's failure to dismiss Juror 8 sua sponte was error because it undermined his right to an impartial jury.

The State responds that Perry's juror bias claim is barred because he did not exercise an available peremptory challenge against Juror 8.  We agree with the State.

Our Supreme Court recently clarified that "if a party allows a juror to be seated and does not exhaust their peremptory challenges, then they cannot appeal on the basis that the juror should have been excused for cause."  *State v. Talbott*, 200 Wn.2d 731, 747-48, 521 P.3d 948 (2022).  In *Talbott*, the trial court denied the defendant's motion to excuse a prospective juror for cause (presumably because of bias).  *Id.* at 735.  Rather than remove the juror with an available peremptory challenge, the defendant affirmatively accepted the jury panel, including the previously challenged juror.  *Id.* at 736.  After he was convicted, the defendant appealed the denial of his for-cause challenge.  *Id.* at 736-37.

Before our Supreme Court, Talbott made a similar argument as Perry; that is, the defendant's constitutional right to a fair trial must be protected by the trial judge's independent obligation to ensure a biased juror does not sit on the panel even when the defendant had an unused peremptory challenge.  *See, e.g.*, Wash. Sup. Ct. oral argument, *State v. Talbott*, No. 100540-7 (Sept. 22, 2022), at 18 min., 24 sec. through 18 min., 41 sec., *video recording by* TVW,

13

Washington State's Public Affairs Network, https://tvw.org/video/washington-state-supreme-court-2022091210/?eventID=2022091210.

The *Talbott* court rejected this argument, holding that if a party does not exhaust their peremptory challenges and allows a juror to be seated, they cannot appeal on the basis that the juror should have been excused for cause. 200 Wn.2d at 747-48. The Supreme Court explained,

> [T]here are good reasons to require parties to use their available peremptory challenges to cure jury-selection errors. Doing so promotes a defendant's right to receive a fair trial in the first instance and prevents unnecessary retrials. This helps to ensure that peremptory challenges are used to "promote, rather than inhibit, the exercise of fundamental constitutional rights."

*Id.* at 746 (internal citation omitted) (quoting *State v. Lupastean*, 200 Wn.2d 26, 52, 513 P.3d 781 (2022)). Any other rule could discourage counsel from curing potential jury-selection errors with peremptory challenges to obtain reversal on appeal. *Id.* at 746-47.

Here, unlike Talbott, Perry did not make a for-cause challenge to Juror 8. Nevertheless, the rationale of *Talbott* still applies. Perry had more than one unused peremptory challenge available when he accepted the panel with Juror 8 seated. Perry had a readily available tool to remove Juror 8 if, indeed, she was actually biased. Regardless of whether Perry previously made a for-cause challenge, if he is allowed to complain about Juror 8's inclusion on the jury after he had the opportunity to cure any potential error with his own peremptory challenge, *Talbott*'s concern with disincentivizing curing errors and preventing unnecessary retrials would be frustrated.[3]

---

[3] We note Perry does not make an ineffective assistance of counsel claim related to Juror 8.

Perry makes no attempt to meaningfully distinguish *Talbott*; his only reference is merely asserting "[*Talbott*] involves the ability to appeal denial of challenges for cause." Reply Br. at 2. Rather, Perry leans into a statement from Division One in *State v. Irby*, 187 Wn. App. 183, 193, 347 P.3d 1103 (2015), *review denied*, 184 Wn.2d 1036 (2016), that " '[t]he presence of a biased juror cannot be harmless; the error requires a new trial without a showing of prejudice.' " Reply Br. at 2. *Irby*'s application here is unpersuasive because it is readily distinguishable on its facts. There, the defendant had waived both his right to be represented at trial and his right to be present. *Irby,* 187 Wn. App. at 188. Thus, the jury was selected without any participation by the defendant or counsel, placing a greater burden on the trial court during jury selection. *Id*. at 189. Because there was no defendant (or counsel) present who could have exercised a peremptory challenge, *Irby* provides no guidance on whether *Talbott* applies to this case.

We hold that Perry is not entitled to appeal Juror 8's presence on the jury because he failed to exhaust his peremptory challenges.[4]

## II. PROSECUTORIAL MISCONDUCT

Perry next argues that the State committed prosecutorial misconduct by arguing facts not in evidence regarding forcible compulsion and marijuana. We disagree.

### A. LEGAL PRINCIPLES

When a petitioner makes a claim of prosecutorial misconduct in a PRP, they must show actual and substantial prejudice from the prosecutor's remarks. *In re Pers. Restraint of Phelps*,

---

[4] *Talbott* suggested that cases involving racial bias may have a different rule because of their " 'unique historical, constitutional, and institutional concerns.' " 200 Wn.2d at 747 (quoting *Peña-Rodriguez v. Colorado*, 580 U.S. 206, 224, 137 S. Ct. 855, 197 L. Ed. 2d 107 (2017)). But here, like *Talbott*, there are no accusations of racial bias.

190 Wn.2d 155, 166, 172, 410 P.3d 1142 (2018) (when a prosecutorial misconduct claim is made in the context of a PRP, the petitioner has an additional "hurdle" of showing actual and substantial prejudice). And if the petitioner fails to show that the complained of remarks were even improper, he necessarily fails to show that he suffered actual and substantial prejudice. *Id.* at 166 (the first "hurdle" is to show the prosecutor committed misconduct).

B. APPLICATION

Perry argues that that the State committed prosecutorial misconduct in closing argument by expressing its own opinion and misstating evidence about why T.G. got into the back seat of the car. Perry further argues that the State's reference to marijuana in rebuttal amounted to arguing facts not in evidence. In neither situation did Perry object to the remarks.

Perry claims the State committed misconduct when it argued T.G. went to the back seat of his car because she was " 'scared,' " " 'frightened,' " and not because she was " 'paying Mr. Perry back.' " PRP at 19 (quoting 8 VRP at 828). But rather than being misconduct, these statements were a reasonable characterization of her testimony. During cross-examination, T.G. testified that she got into the back seat of Perry's car because she was "scared" and she rejected defense counsel's characterization of her testimony as having any "responsibility" to get in the back seat to pay Perry back for the food that he provided to her. 4 VRP at 462. Therefore, the State's argument about T.G.'s state of mind was directly supported by the evidence and not improper. *State v. Thorgerson*, 172 Wn.2d 438, 448, 258 P.3d 43 (2011) (prosecutors have wide latitude to argue reasonable inferences from the evidence in closing argument).

Similarly unpersuasive is Perry's argument that the State improperly introduced the topic of marijuana in rebuttal. Defense counsel introduced, and opened the door to, the topic of

marijuana in his closing argument as part of his theory of the case—first, by suggesting that Perry would not have been foolish enough to use a debit card to purchase cigars with which to smoke marijuana when he was with C.B. and second, by suggesting that T.G. met up with Perry for marijuana and not food.

The State was therefore permitted to respond to defense counsel's arguments about marijuana. *State v. Russell*, 125 Wn.2d 24, 87, 882 P.2d 747 (1994), *cert. denied*, 514 U.S. 1129 (1995) (the prosecutor is entitled "to make a fair response to the arguments of defense counsel" and it is not misconduct to argue that the evidence does not support the defense's theory of the case). The State's rebuttal arguments fall within the acceptable bounds of responding to defense counsel's theories.

Considering that Perry fails to show that any of the State's remarks were improper, Perry cannot show that he was actually and substantially prejudiced. *See Phelps*, 190 Wn.2d at 166, 172. Thus, Perry's prosecutorial misconduct argument fails.

III. CREDIT FOR TIME SERVED

Perry argues that he has been wrongly deprived of credit for the time that he was held in Thurston County after his Pierce County arrest warrant was issued until the date of his arraignment in Pierce County. We conclude Perry has not established he is entitled to relief.

To meet their burden in a personal restraint petition, the petitioner must state with particularity facts that, if proven, would entitle the petitioner to relief. *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086, *cert. denied*, 506 U.S. 958 (1992). Bald assertions and conclusory allegations are not sufficient. *Id.* Arguments made only in broad, general terms are also insufficient. *In re Pers. Restraint of Rhem*, 188 Wn.2d 321, 327-28, 394 P.3d 367 (2017).

17

As noted in the form used for Perry's judgment and sentence, DOC is responsible for calculating credit for time served. *See In re Pers. Restraint of Costello*, 131 Wn. App. 828, 835, 129 P.3d 827 (2006) ("DOC[] . . . provided [petitioner] with all the credit he was entitled to by law" under former RCW 9.94A.120(17), the prior version of RCW 9.94A.505(6)). *See also In re Postsentence Review of Combs*, 176 Wn. App. 112, 119, 308 P.3d 763 (2013) (DOC, rather than the trial court, calculates credit for time served under the drug offender sentencing alternative statute).

Perry argues that he was wrongly deprived of credit for time that he was confined in Thurston County between May 8, 2017, (the issuance date of his Pierce County arrest warrant) and March 5, 2018 (the Pierce County arraignment date). Perry requests a remand for resentencing or a reference hearing in the alternative.

But calculating credit for time served is DOC's obligation. And Perry has not established what the DOC has or has not done with respect to his credit for time served. As a result, Perry has not established a factual basis for relief and his claim fails. *See Rice*, 118 Wn.2d at 886. For the same reason, Perry also is not entitled to a reference hearing. *Id.* ("[T]he purpose of a reference hearing is to resolve genuine factual disputes, not to determine whether the petitioner actually has evidence to support his allegations."). Accordingly, we hold that Perry is not entitled to collateral relief on this basis.

## CONCLUSION

Because Perry has not shown he is entitled to collateral relief, we deny his PRP.

_____
PRICE, J.

We concur:

_____
CRUSER, A.C.J.

_____
MAXA, J.